# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

**UNITED STATES OF AMERICA,**

    **Plaintiff,**

    **v.**

**MATHIAS MORA,**

    **Defendant.**

Crim. No. 16-4358 MV

## MEMORANDUM OPINION AND ORDER

**REAGAN, Chief Judge[1]:**

    This matter is before the Court on Defendant Mathias Mora's Motion to Suppress Evidence and Statements [Doc. 21]. The Court conducted a hearing on the motion on August 10, 2017.

    Mr. Mora's Motion to Suppress Evidence and Statements is DENIED in all respects. While it is a basic principle of Fourth Amendment jurisprudence that searches and seizures inside a home without a warrant are presumptively unreasonable (*See Brigham City v. Stuart*, 547 U.S. 390, 606 (2006)), the Government has provided compelling evidence that the carefully limited, short duration "sweep" of Mr. Mora's home was not unconstitutionally impermissible. The credible testimony of the officers ultimately responsible for conducting the sweep that the sweep was necessary, based upon exigent circumstances, due to the possibility that missing or possibly harmed undocumented immigrants might be in the home, carried the day for the Government.

    Furthermore, the Court concludes that the agents had probable cause to arrest Mr. Mora,

---

[1] Sitting by designation

that Mr. Mora was properly *Mirandized*, that the affidavits in support of search warrants for Mr. Mora's house and the tractor-trailer he drove established probable cause for issuance of the warrants, and that statements made by and evidence seized from Mr. Mora are admissible at trial in this case.

## I. Background

Mr. Mora has been charged with seven counts of transporting illegal aliens, in violation of 8 U.S.C. § 1324(a)(1)(A)(ii), and one count of felon in possession of firearms in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).

On October 27, 2016, agents from the Department of Homeland Security ("HSI") in Albuquerque received a call from Bernalillo County Sheriff's Office ("BCSO") task force officers. The task force officers had fielded a call from a person reporting a semi-truck that was parked behind the Albertsons Market at the intersection of Rio Bravo and Isleta. The caller had seen between 30 and 60 people exiting the back of the semi-truck and walking around the parking lot. BCSO and HSI agents drove to the Albertsons, where they found 14 undocumented immigrants in the area. The semi-truck, however, was gone.

Agents fanned out, searching for the missing vehicle. Shortly thereafter, it was located in the parking lot of the Walmart at the intersection of Coors and Rio Bravo. The cab was locked, but the rear trailer doors were not. Agents opened the doors of the trailer and found that it was empty except for a Sure Fine vegetable oil bottle filled with a yellow substance that smelled like urine. Based on the statement of the eyewitness and the evidence at the scene, agents believed that some of the people who had been inside the trailer were missing. Agents were able to determine from the license plate and the placards on the semi-truck that the truck belonged to Mr. Mora and the trailer belonged to Swingline Transport.

2

Surveillance video from the Walmart was obtained. It showed the semi-truck pulling into the Walmart parking lot and parking. An individual then emerges from the semi-truck, walks toward the store, and goes inside. Video from inside the store showed the individual pick up a 12-pack of Dos Equis beer, purchase the beer and a package of tortillas, exit the store, and walk toward the tractor-trailer before being picked up by a car.

Based on information provided by Swingline Transport, HSI obtained Mr. Mora's home address and dispatched agents to his home. Shortly thereafter, Mr. and Mrs. Mora arrived home in a car that appeared to be the same car seen picking the individual up in the Walmart parking lot. The agents arrested Mr. Mora and detained Mrs. Mora. Mrs. Mora declined permission to search the house. Agents made a decision to conduct a sweep of the house for both security and humanitarian reasons. During the three-minute sweep, agents observed ammunition boxes and what appeared to be a gun safe. Later in the day, agents obtained and executed search warrants for the house and the semi-trailer. At the house, they found, *inter alia*, guns and ammunition.

## II. Motion to Suppress

In support of his Motion to Suppress, Defendant asserts that agents did not have probable cause to arrest him, that he was improperly *Mirandized*, that the "protective sweep" of his house was unconstitutional and, therefore, any information gathered during the sweep could not be used to support the search warrant applications, that the affidavits submitted in support of the search warrants did not establish probable cause to search his house or trailer, and that any evidence seized from Defendant, including his post-arrest statements, must be suppressed as fruits of the poisonous tree.

## III. Analysis

### A. Probable Cause for Arrest

Mr. Mora contends that agents did not have probable cause to arrest him. Specifically, he argues that there is no evidence that he was the person who drove the truck into the Albertsons parking lot, or that, if he was the driver of the truck, there is no evidence that undocumented immigrants had been in or emerged from the trailer while he was in control of it.

"Probable cause" means "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979). Courts must "look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing.'" *United States v. Ledesma*, 447 F.3d 1307, 1316 (10th Cir. 2006) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). Probable cause requires "only the probability, and not a prima facie showing, of criminal activity." *Spinelli v. United States*, 393 U.S. 410, 419 (1969). Probable cause does not require that an officer's belief about the commission of a crime or that certain items may be useful as evidence "be correct or more likely true than false." *Texas v. Brown*, 460 U.S. 730, 742 (1983).

HSI Special Agent Steven Lopez testified at the suppression hearing that on the morning of October 27, 2016, HSI in Albuquerque took a call from task force officers at the Bernalillo County Sheriff's Office ("BCSO"), advising that BCSO had received a call from a person informing them there was a semi-truck parked behind the Albertsons at the intersection of Rio Bravo and Isleta. TR at 7. According to Agent Lopez, the caller reported that he had seen between 30 and 60 people getting down from the trailer area of the semi-truck and walking

around the parking lot. TR at 7-8. The caller described the vehicle as a white semi-tractor with an Iowa license plate and a Halloween-type mask on the cab's passenger-side visor. TR at 13. BCSO and HSI agents, including Agent Lopez, drove to the Albertsons where they found 14 undocumented immigrants milling around the area. *Id.* Based on the discrepancy between the number of people the caller reported seeing and the number of people there when law enforcement arrived at the parking lot, the agents believed there were people missing. TR at 8. The 14 undocumented immigrants were taken to the HSI office and interviewed. TR at 14. None of the people interviewed could identify the driver of the semi-truck. Govt. Ex. 20 at p. 3, ¶ 8; Govt. Ex. 22 at p. 4, ¶ 7. Many of them stated that they were smuggled across the United States border and transported in the trailer of the semi-truck. *Id.* Some of the undocumented immigrants stated that when they were being loaded into the trailer, the driver hid behind the door of the truck and told them to get in. *Id.* Some stated that when they were released in the morning, the driver again hid behind the doors of the trailer and told them to run and not look back. *Id*. Agent Lopez admitted that during those interviews, no one indicated that someone might be injured or in distress at Mr. Mora's house. TR at 47-48. However, he also testified, based on his experience in interviewing hundreds of undocumented immigrants, that they are not normally forthcoming with information. TR at 56.

The semi-truck was no longer at the Albertsons when agents arrived, and the Albertsons parking lot did not have a security camera. TR at 7, 27. After the eyewitness provided a description of the semi-truck, BCSO and HSI agents fanned out, searching the area for it. TR at 7. Soon thereafter, BCSO agents located a truck that fit the description approximately one to two miles from the Albertsons in the parking lot of a Walmart at the intersection of Coors and Bravo. TR at 7-8. The cab had a Halloween mask hanging from the passenger-side visor. TR at 13;

Govt. Ex. 18.  A placard on the driver's side of the vehicle bore the name "Swingline Transport, Cedar Rapids, Iowa."  TR at 8; Govt. Ex. 10.  An intelligence resource specialist at HSI telephoned Swingline Transport and was given Mr. Mora's name and address as the driver and possible owner of the vehicle.  TR at 11.  The semi-trailer had other placards from which the agents determined that Mr. Mora did not own the trailer.  TR at 11-12; Govt. Exs. 11-12.

The agents were concerned that there might still be people in the trailer.  TR at 15.  They tried to open the doors of the cab, but they were locked.  *Id.*  Michael Bates, a technical enforcement officer at Homeland Security, opened the trailer's rear doors, which were unlocked.  TR at 41-42.  There were no people inside, and the only thing they found was a Sure Fine vegetable oil bottle filled with what smelled like urine.  TR at 15-16; Govt. Exs. 16-17.[2]  Officer Bates told Agent Lopez that the trailer smelled like body odor.  TR at 43.  No other odd smells were noticed.  *Id.*

There was no food or water inside the trailer, it had no bathroom facilities, and it was not equipped with any passenger safety restraints.  TR at 21.  In Agent Lopez's opinion, the people in the tractor-trailer had been treated as cargo.  TR at 22.  Agent Lopez testified that in the past, Mexican cartels traditionally smuggled only narcotics, but, more recently, they had become involved in smuggling people.  TR at 22-23.  The cartels use guides to transport the undocumented immigrants from Mexico into the United States, crossing extremely dangerous areas through the desert without water.  TR at 23.  If people can't keep up, they are left behind.  *Id.*  Once they are in the United States, they are taken to "stash houses," where they are usually held by armed guards.  TR at 23, 25.  They are kept at the stash house until there are enough people going to a certain location, and then they "break people off," to that location.  TR at 25.

---

[2] Agents were unable to locate a laboratory that would test the contents of the bottle.  TR at 16.

Agent Lopez testified that the undocumented immigrants stay in the stash houses from as little as one day to as long as three weeks. *Id.*

According to Agent Lopez, human smuggling organizations usually provide a guarantee that the undocumented immigrants will get to their final destination. TR at 26. If the undocumented immigrants are picked up by Immigration and removed, the smugglers don't get paid. *Id.* The agent testified that this was "an extremely highly unusual investigation in that [the people] were dumped behind this Albertsons," and based on interviews with several of them, "it didn't seem like many, if [any] at all, were coming to Albuquerque." *Id.* Instead, "[t]hey were going to various parts of the country." *Id.* He testified that HSI had never seen this in Albuquerque before. *Id.*

The unusual circumstances led Agent Lopez to believe "something went wrong" and as a result, "the driver dumped his cargo in a location that seemed to be perfect for doing this, because there was no cameras, there was not anything behind the location" and "[i]t just doesn't make sense to me whatsoever." TR at 27. Based on his training and experience, and information he had from other districts, Agent Lopez knew that during smuggling operations, "[p]eople die in transit, whether it's in the desert, whether it's in tractor-trailers, whether it's in the back of a box truck, whether it's in a truck and they flip over." *Id.* Agent Lopez testified that when he interviewed the immigrants, they indicated that they initially didn't know where they were until they saw New Mexico license plates. Many of them did not have cell phones, and they did not know how they were going to get to their location. TR at 28.

Agents obtained and reviewed surveillance video from Walmart. TR at 17, 52; Govt. Ex. 23. The surveillance video shows a white semi-truck pulling into the Walmart parking lot and parking. Then an individual gets out of the cab of the truck and walks into the store. Ex. 23.

Video from inside the store shows the individual pick up a 12-pack of Dos Equis beer, purchase it and a package of tortillas, exit the store, and walk back toward the tractor-trailer. The person is then seen being picked up by what appears to be a gold car. *Id*. The individual in the video appears to be Mr. Mora. *Id.*

After watching the video, Agent Lopez directed other law enforcement agents to go to Mr. Mora's house and arrest him. TR at 53. HSI Special Agent Scott Pharis, who was on site at the Walmart and, subsequently, at Mr. Mora's house, testified that the streets in Mr. Mora's neighborhood would accommodate a semi-truck. He further testified that he believed that the undocumented immigrants could have been transported to Mr. Mora's house by car. [TR. at 121, 125].

The Court concludes that the following evidence established probable cause for the arrest of Mr. Mora:

- the call from a witness who had seen the semi-truck in the Albertsons parking lot and reported between 30 and 60 people had exited from the trailer; the disappearance of the truck from the lot; the discovery that only 14 people remained by the time HSI arrived; the confirmation that the people were undocumented immigrants;

- the disorientation of the immigrants;

- the discovery of the semi-truck at the Walmart parking lot;

- the determination that the tractor belonged to Mr. Mora, who lived nearby;

- the observation that the trailer had no food, water or safety restraints and was empty except for a cooking oil bottle full of what smelled like urine; and

- the surveillance video of an individual who appears to be Mr. Mora walking from the truck into the Walmart, buying beer and tortillas, walking out of the store toward the truck and getting into a gold car.

All of this evidence supports the agents' belief that Mr. Mora was the driver of the semi-truck

8

and that he had been transporting undocumented immigrants.[3] Therefore, the Court rejects Mr. Mora's argument that law enforcement agents lacked probable cause for his arrest.

### B. Whether Defendant was Properly *Mirandized*

Mr. Mora asserts agents failed to read him his *Miranda* rights before questioning him. After his arrest, Mr. Mora was placed in Agent Thomas Sanchez's vehicle. *Id.* at 66. Agent Lopez arrived between two and ten minutes later. *Id.* Agent Lopez read Mr. Mora his *Miranda* rights and then interviewed him about the potential human smuggling. *Id.* at 28-29.

Agent Lopez testified that during his 17 to 18 years as a federal agent, he has conducted hundreds of custodial interviews. TR at 29. Normally he reads suspects the *Miranda* warning from a piece of paper then has them sign and date it; however, since he had been called out immediately and didn't have his gear bag with him, he could only read Mr. Mora the warning using a *Miranda* card that he keeps in his pocket. TR at 29-30; Govt. Ex. 24. The card has the *Miranda* warning in English on one side and Spanish on the other. Govt. Ex. 24. Ordinarily, Agent Lopez also records the reading of *Miranda* rights and interviews, but he could not do so in this case—again, because he didn't have his gear bag. TR at 30-31. Agent Sanchez confirmed Agent Lopez's testimony, stating that he didn't remember whether Agent Lopez read the *Miranda* warning to Mr. Mora in English or Spanish, but that Mr. Mora had no trouble understanding it, and thereafter agreed to talk to Agent Lopez. TR at 62-63.

---

[3] HSI Supervisory Special Agent Gabriel Lucero testified that further database queries revealed the same tractor-trailer passed through the Las Cruces Border Patrol Check Point located on Interstate 25 on October 27, 2016 at 04:57:43 hours. The truck was northbound. Database inquiries also revealed photographs of the tractor-trailer and the driver. The driver in the photograph appears to be Defendant. The white Halloween mask on the passenger visor is also visible. [TR at 151-153]. Although this information was not obtained until after Mr. Mora's arrest, Special Agent Lopez's affidavits in support of applications for search warrants for the house and trailer—completed later that day— include references to the tractor-trailer's passage through the Border Patrol Check Point and the picture taken at the check point. [Govt. Exs. 20, 22].

After Agent Lopez had read Mr. Mora his *Miranda* rights, he was able to obtain a recording device from Special Agent Sanchez or Pharis, and the custodial interview of Mr. Mora was recorded. TR at 33-34. Mr. Mora, who testified on his own behalf, failed to rebut the agents' testimony that he was read the *Miranda* warning. TR at 201-213. Accordingly, the Court rejects Mr. Mora's argument that he was not read his *Miranda* rights.[4]

## C. Constitutionality of the Protective Sweep

Mr. Mora argues the protective sweep of his house was unconstitutional. The Government contends the sweep of the home was constitutionally permissible based on concerns about officer safety and the belief that the unaccounted-for undocumented immigrants, possibly injured, might be in Mr. Mora's home.

"With few exceptions, the question whether a warrantless search is reasonable and hence constitutional must be answered no." *Kyllo v. United States*, 533 U.S. 27, 31 (2001). However, in *Maryland v. Buie*, 494 U.S. 325, 334 (1990), the Supreme Court held that "as an incident to . . . arrest . . . officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." In so ruling, the court stated, "Beyond that, however, we hold that there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id.*

A warrantless search "must be strictly circumscribed by the exigencies which justify its initiation." *Mincey v. Arizona*, 437 U.S. 385, 392 (1978). However, "the Fourth Amendment

---

[4] Citing *Terry v. Ohio*, 392 U.S. 1, 24, 27 (1968), Mr. Mora also contends agents did not have cause to search him or remove items from his pockets. However, Mr. Mora misapprehends the law. The testimony of the agents establishes that Mr. Mora was not merely detained for an investigative detention; rather he was actually placed under arrest.

does not bar police officers from making warrantless entries and searches when they reasonably believe that a person is in need of immediate aid." *Id.* The Supreme Court explained that "[o]ne exigency obviating the requirement of a warrant is the need to assist persons who are seriously injured or threatened with such injury." *Id.* at 403.

In *Brigham City, Utah v. Stuart*, 547 U.S. 398, 404 (2006), the Supreme Court explicitly rejected the argument that, in assessing the reasonableness of an entry, the subjective motivations of officers should be considered. *Id.* at 404-405. Before *Brigham City*, the Tenth Circuit used a three-part test to determine whether the risk of personal danger created exigent circumstances: "(1) the officers must have reasonable grounds to believe that there is an immediate need to protect the lives or safety of themselves or others; (2) the search must not be motivated by an intent to arrest or seize evidence; and (3) there must be some reasonable basis, approaching probable cause, to associate the emergency with the place to be searched." *United States v. Thomas*, 372 F.3d 1173, 1177 (10th Cir. 2004). After *Brigham*, The Tenth Circuit adopted a two-part test: "whether (1) the officers have an objectively reasonable basis to believe there is an immediate need to protect the lives or safety of themselves or others, and (2) the manner and scope of the search is reasonable (a modification of our former third prong)." *United States v. Najar*, 451 F.3d 710, 718 (10th Cir. 2006).

### 1. Need to Protect Lives or Safety of Themselves or Others

The Court finds the Government's first justification for the sweep—officer safety—unpersuasive because the evidence establishes there were safe havens outside the house where the officers could have interviewed, searched, and arrested Mr. Mora without exposing themselves to harm. To permit a sweep of the house, absent anything other than a concern for officer safety, would be to let the exception swallow the rule.

11

However, the Court concludes the Government's second justification for the sweep—the well-being of the missing undocumented immigrants—to be persuasive. The agents had reasonable grounds to believe there was an immediate need to protect the lives of those who had been in the trailer. Specifically, and as set forth in Section III.A. above, the agents knew that:

- a witness at Albertsons saw between 30 and 60 people exit the back of a semi-truck trailer and mill around the parking lot, and the witness saw a mask on the visor in the passenger side of the cab;[5]

- by the time law enforcement arrived, the semi-truck was gone and only 14 of the individuals remained, so between 16 and 46 individuals were unaccounted for;

- none of the individuals had proper documentation;

- when interviewed, the undocumented immigrants were disoriented, and some said they were unaware they were in Albuquerque;

- the undocumented immigrants had been loaded and unloaded by a man who stood behind the door of the trailer and told them not to look back;

- Agents knew that cartels are now involved in human smuggling, that they treat their clients as cargo, and that they have been known to dump dead clients;

- When the tractor-trailer was located at the nearby Walmart, the trailer was empty and agents found no food, water, bathroom facilities or personal restraints, such as seat belts, in the trailer;

- Agents could not account for the whereabouts of the tractor-trailer between the time it was sighted at the Albertsons and the time it was found at Walmart;

- Cartel smugglers have been known to subject the individuals they are transporting to inhumane and life-threatening conditions;

- Smugglers also commonly hold their clients in stash houses, frequently under armed guard, until the time comes to transfer them to their ultimate destination;

---

[5] As previously noted, at some point after the decision to arrest Mr. Mora was made, agents became aware that the semi-truck trailer, driven by a man who looked like Mr. Mora, and with a Halloween mask on the passenger-side visor of the cab, had driven northbound through the Las Cruces Border Patrol Check Point located on Interstate 25 on October 27, 2016 at 04:57:43 hours. The information was included in the affidavits in support of the search warrant applications. However, it is unclear from the record exactly when agents obtained this information.

12

and

- Mr. Mora's home is not far from the Albertsons and Walmart, and the streets of his neighborhood would accommodate a tractor-trailer. Additionally, it would have been possible for Mr. Mora to transport the undocumented immigrants from the Albertsons parking lot to his house by car.

The Court concludes the Government has established that officers had reasonable grounds to believe there was an immediate need to protect the lives of others.[6]

## 2. Manner and Scope of Search

Agent Pharis, Special Agent Madrid, and two uniformed officers from BCSO conducted a sweep of Mora's house, which was a fairly large two-story house with at least three or four bedrooms and a garage. TR. at 82-83, 87. The sweep lasted from 10:54 a.m. to 10:57 a.m.. *Id.* at 83; Ex. 19. The officers cleared the house two to a room looking for any people who might have been on the tractor-trailer load. *Id.* at 83. The only places they looked were those consistent with where a human could hide: "under beds, in closets, things of that nature." *Id.* at 87.

The Court concludes that the manner and scope of the search was reasonable. Important

---

[6] Moreover, while the subjective belief of the agents is no longer relevant in the wake of *Brigham*, the Court concludes—based on the testimony of Agents Lucero and Pharis—that the agents sincerely believed the lives of undocumented immigrants could be in danger. Both testified they knew that if they made the wrong call in conducting a protective sweep, any evidence they discovered in the house might be subject to suppression. TR at 120-121; 148-149. Nonetheless, they decided to conduct the sweep because, in the words of Agent Lucero, he would have chosen human life over Fourth Amendment "100 percent of the time." TR at 149.

The Court finds the testimony of Agents Lucero and Pharis credible on the critical issue of their claim the protective search was necessary for humanitarian purposes: to find additional missing undocumented immigrants who may have been in jeopardy. The Court very closely observed their manner and demeanor while testifying. They did not embellish or engage in any furtive conduct. They answered the questions asked and did not volunteer. They, unlike Mr. and Mrs. Mora, spoke objectively and not as advocates. The story the agents told was consistent and sensible. Consequently, the Court finds credible and persuasive that they had a reasonable basis to believe there was an immediate need to protect the lives and safety of the missing immigrants by conducting a carefully limited search for them in the Mora house.

13

to the Court's analysis is that the sweep was limited in scope and duration. The entire inspection of the large, two-story home was completed in about three minutes. The search was limited to looking for undocumented immigrants, so nothing was viewed or disturbed unless a person could be found by doing so. For example, drawers were not opened, and photographs were not taken.

Accordingly, Mr. Mora's motion to suppress based on the protective sweep is denied.

### D. Whether Affidavits Established Probable Cause to Search House and Trailer

Mr. Mora argues that evidence obtained during execution of the search warrant should be excluded because the affidavit in support of the warrant was based on evidence seized from his illicit arrest and the warrantless sweep of his home. "An affidavit containing erroneous or unconstitutionally obtained information invalidates a warrant if that information was critical to establishing probable cause." *United States v. Snow*, 919 F.2d 1458, 1460 (10th Cir. 1990). However, the Court, having found that the protective sweep was warranted based on the agents' concern over the well-being and safety of the missing undocumented immigrants, concludes that the information concerning the gun safe and ammo boxes was lawfully obtained. Accordingly, the Court rejects Mr. Mora's argument that the evidence obtained during the execution of the search warrant must be excluded.

Mr. Mora also contends the issuing magistrate was misled because the affidavits in support of the search warrants falsely stated that agents involved in the sweep had seen a "gun safe" and "ammunition storage boxes." [Govt. Ex. 20, ¶ 5; Govt. Ex. 22, ¶ 5]. He argues that the safe was "one sold by retailers to keep a family's valuable belongings secure" and that there was no evidence that what agents considered ammunition boxes actually contained ammunition or belonged to Mr. Mora, as opposed to his wife or son.

Agent Pharis testified that, based on his past experience as an officer in the United States

Army, and his current experience as an HSI agent and a game hunter, he believed the safe in question was a gun safe. TR at 90-92; Defendant's Ex. B. He described the safe as being about four feet tall, which he testified would be tall enough to hold a rifle standing up. TR at 91-92. The Court, having viewed Defendant's Ex. B, concludes the affidavit's description of it as a "gun safe" was not misleading. Agent Pharis also testified that based on both his Army and Homeland Security experience, the boxes at issue—Government Exs. 4-5—were ammo cans that are designed to hold and typically do hold ammunition. TR at 93-94. The Court, having reviewed Government Exhibits 4 and 5, concludes that is not misleading to describe the containers as ammunition cans.

Therefore, the Court rejects Mr. Mora's argument that the affidavits in support of search warrants falsely stated agents involved in the sweep had seen a gun safe and ammunition boxes.

## IV. CONCLUSION

For the reasons set forth above, Mr. Mora's Motion to Suppress [Doc. 21] is **DENIED**. ENTERED this 17th day of October, 2017.

Digitally Signed By
Chief Judge Michael J. Reagan
United States District Court
Southern District of Illinois

2017.10.17
10:48:44 -05'00'

U. S. DISTRICT JUDGE MICHAEL J. REAGAN